UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


VINCENT DESALVO                              CIVIL ACTION

VERSUS                                       NUMBER: 07-3950

MICHAEL J. ASTRUE, COMMISSIONER OF           SECTION: "B"(5)
SOCIAL SECURITY ADMINISTRATION


### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. doc. 15, 16).

Vincent Desalvo, plaintiff herein, filed the subject application for DIB and SSI benefits on August 10, 2005, alleging disability as of April 19, 2003.  (Tr. pp. 50-53).  In a Disability Report that appears in the administrative record, arthritis in the back and shoulders, numbness in the feet, depression, bad knees, muscle spasms, anxiety, and cataracts were identified as the

conditions resulting in plaintiff's inability to work.  (Tr. pp. 67-73).[1]/  Plaintiff's application for DIB and SSI benefits was denied at the first step of the Commissioner's administrative review process, following which he requested a hearing de novo before an Administrative Law Judge ("ALJ").  (Tr. pp. 34-37, 31-32).  That hearing went forward on October 26, 2006, at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 273-291).  On December 15, 2006, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act.   (Tr. pp. 14-24).   The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-6).  It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment, plaintiff frames the issue for judicial review as follows:

[t]he ALJ's credibility analysis was inadequate and unsupported by substantial evidence.  The ALJ used an

---

[1]/ Plaintiff subsequently amended the alleged onset date from April 19, 2003 to July 20, 2005.  (Tr. pp. 270, 275).  He also limited the alleged disabling conditions to "L5-S1 disc herniation compression of the right S1 nerve root, right L4 and S1 radiculopathy resulting in chronic severe pain."  (Tr. p. 270).

improper legal standard in assessing the claimant's
subjective complaints of pain.

(Rec. doc. 15-2, p. 1).

Relevant to the issue to be decided by the Court are the

following findings made by the ALJ:

1.  [t]he claimant has not engaged in substantial work
    activity since April 19, 2003, and he met the disability
    insured status requirements of Title II on that date, at
    least through December 31, 2008.

2.  [t]he claimant has the "severe" impairments of status
    post right-sided microdiscectomy at the L5-S1 level in
    January 2004; degenerative disc disease of the lumbar
    spine at the L3-4, L4-5 and L5-S1 levels; degenerative
    disc disease of the cervical spine at the C5-6 and C6-7
    levels; and status post surgical repair of the tendons in
    the left hand, with full restoration of flexion and
    extension of the left index finger.  Although "severe,"
    the claimant's impairments do not meet or equal any
    listed impairments found at 20 CFR, Part 404, Subpart P,
    Appendix 1.

3.  [t]he claimant has pain and functional limitations
    resulting from the pain, but his complaints related to
    same are not as severe as alleged and are not credible.

4.  [t]he claimant has the residual functional capacity to
    perform a light level of work, restricting him to lifting
    and/or carrying no more than 20 pounds occasionally, 10
    pounds frequently; standing and/or walking no more than
    6 hours in an 8 hour day; sitting up to 6 hours in an 8
    hour day; the ability to alternate between sitting and
    standing; limitations on pushing or pulling as listed
    under lifting and/or carrying; occasional stooping or
    bending; no repetitive lifting; no working with arms
    above shoulder level; and occasional looking down while
    working.

5.  [t]he claimant cannot perform his past relevant work.

6.  [t]he claimant is presently 45 years of age, defined as

3

a younger individual, with a twelfth grade education and skilled work history, but no skills transferable to light level work.

7.    [t]he claimant is able to perform a significant number of other jobs in the national and local economy, including cashier, information clerk, food order clerk, and unskilled dispatcher. The cashier jobs were described by the vocational expert as follows: cashier (sedentary, semi-skilled/SVP 3:708,276 national economy; light, unskilled: 1,450,550 national economy: light, semi-skilled/SVP 3: 1,113,005 national economy). This finding is based on the testimony of the vocational expert and supported within the framework of Rule 202.21 of the Medical-Vocational Guidelines.

8.    [t]he claimant is not under a "disability," as defined in the Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. pp. 23-24).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 St.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's

decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).
Substantial  evidence  is  more  than  a  scintilla,  less  than  a
preponderance, and is such relevant evidence as a reasonable mind
might  accept  as  adequate  to  support  a  conclusion.  Jones v.
Heckler, 702 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the
evidence are  for  the  Commissioner  to  resolve,  not  the  courts.
Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant  seeking  DIB  or  SSI  benefits  bears  the  burden  of
proving that  he  is  disabled  within  the  meaning  of  the  Social
Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).
Disability is  defined  as  the  "inability  to  engage  in  any
substantial  gainful  activity  by  reason  of  any  medically
determinable physical or mental impairment which ... has lasted or
can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the
claimant carries his initial burden, the Commissioner then bears
the burden  of  establishing  that  the  claimant  is  capable  of
performing substantial gainful activity and is, therefore, not
disabled.  Harrell, 862 F.2d at 475.  In making this determination,
the Commissioner utilizes the 5-step sequential analysis set forth
in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1. an  individual  who  is  working  and  engaging  in
> substantial gainful activity will not be found disabled
> regardless of the medical findings.

5

2.  an individual who does not have a "severe impairment" will not be found to be disabled.

3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4.  if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5.  if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first 4 steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  May v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

At the time of the administrative hearing that was held on

October 26, 2006, plaintiff lived by himself, was 45 years of age, and had completed 12 grades of formal education.  His past relevant work experience included that of a shipfitter, jeweler, and structural fitter. (Tr. p. 68). After the admission of the previously-assembled exhibits, plaintiff took the stand and was questioned by the ALJ.  Since the amended onset date, plaintiff testified that he had unsuccessfully tried to return to work on several occasions.  His most recent attempt had been with an ornamental iron work company but he was let go after a few weeks because he could not perform the work at the required pace. (Tr. pp 287, 56-61).  Plaintiff testified that he experienced 6 months of pain relief after undergoing surgery in February of 2003 to remove a spur that was impacting his sciatic nerve but that additional problems had been revealed through a more recent MRI.  According to counsel, that testing revealed marked disc space narrowing at L5-S1, several disc bulges at L4-5 and L5/S1 as well as epidural fibrosis surrounding the right S nerve roots, and scar tissue surrounding the right S-1 serve root. (Tr. pp. 275-277).

Thomas Meunier, a VE, was next to take the stand.  The ALJ proceeded to pose a hypothetical question to the VE which included the limitations noted by Dr. Adatto in his report of September 21, 2006.  Those included limitations against repetitive stooping or bending and repetitive lifting of objects over 10 to 20 pounds;

limitations against prolonged sitting or standing in the same position for 45 minutes, give or take 15 minutes, without being able to move about and alternate positions; and, limitations against repetitive looking up and down or working with arms above the shoulder level. In answer thereto, the VE testified that the individual described in the hypothetical question could not perform plaintiff's past work, including, in all likelihood, that of a jeweler. However, the described individual could function as a cashier, information clerk, food audit clerk, or dispatcher, with significant numbers of such jobs existing in the economy. (Tr. pp. 278-279).

Plaintiff was then questioned further by the ALJ. He testified that his daily routine consisted of taking his pain medication and then doing as little as possible so as not to aggravate his symptoms. Upon further prodding by the ALJ, plaintiff testified that he could perform light household chores for maybe an hour, following which he would wait to take his next dose of pain medication. However, even this limited activity would necessitate a 5 to 6 hour recovery period. He did use a brace which was only partially helpful, was unable to exercise secondary to pain, and had no "good" days when his pain was less in intensity. Plaintiff estimated that he could walk/stand for only 1 hour before experiencing severe back and shoulder pain and leg

8

numbness.   He took Soma 4 times daily for pain relief and
constantly readjusted positions throughout the day and night in an
attempt to lessen his discomfort.   On an almost daily basis,
plaintiff also had to lie down for 20 minutes 4 times per day to
reduce his symptoms.   Plaintiff could not run and tried to avoid
driving although he had driven himself to the hearing.  He did very
little grocery shopping, prepared simple meals, only occasionally
got out of the house, and watched TV for entertainment.   According
to plaintiff, his prescribed medication effected both his
concentration and his memory such that he could not even perform a
simple job.   Making matters worse, plaintiff testified that he had
slammed his finger in a car door 3 months earlier, cutting 2
tendons and reducing fine manipulation on the left.   The accident
also resulted in him having no lifting ability on that side because
he was missing a left finger.

Plaintiff's attorney then asked the VE what the effect on the
identified job base would be if plaintiff had to frequently
alternate positions due to pain.  In answer to that question, the
VE testified that the numbers of some available jobs would be
reduced but not others, using as an example sedentary cashier
positions which generally allow for a sit/stand option. (Tr. pp.
279-291).

The medical records admitted in the administrative proceedings

9

below indicate that plaintiff was seen by Dr. Gregory Dowd on September 26, 2003 for complaints of right buttock and right leg pain which was brought on after using a ladder at work.  The impression was right leg pain, likely representing radiculitis.  A Medrol Dosepak was prescribed and plaintiff was to undergo an MRI. (Tr. pp. 105, 136).  That diagnostic test was performed on October 10, 2003 and it revealed a right paracentral L5-S1 herniated disc and bulging of the L3-4 and L4-5 discs. (Tr. p. 118).  Plaintiff's pain was no better when he returned to Dr. Dowd on October 24, 2003 and it had caused him to substitute his shipfitting job with a less strenuous job in the family's real estate business. The diagnosis was L5-S1 disc herniation causing right lumbar radiculitis. Surgical options were discussed with plaintiff but he was continued on his pain medication at that time in light of his ongoing evaluation for a nodule in his neck. (Tr. p. 135).  Plaintiff's neck problem had resolved by December 23, 2003 but he was still experiencing back pain radiating into the right leg which had worsened.  In light of his persisting symptoms, plaintiff elected to proceed with surgery. (Tr. pp. 112-116, 134, 133).

On January 19, 2004, plaintiff underwent a right L5-S1 lumbar microdiskectomy at the hands of Dr. Dowd.  Plaintiff tolerated the procedure well and was discharged home the following day. (Tr. pp. 108-111, 117).  At his first post-operative visit, plaintiff was

"doing quite well" with less back and leg pain.  Plaintiff was to gradually increase his activities and it was hoped that he could be cleared for light-duty work and physical therapy in 4 weeks. (Tr. p. 132). Plaintiff reported a near resolution of his right leg pain when he returned to Dr. Dowd on March 5, 2004.  Plaintiff was to commence with physical therapy and was cleared to resume light-level work with a lifting limit of 25 pounds and with minimal bending, stooping, and squatting. (Tr. p. 131).  Physical therapy was thereafter begun on March 15, 2004. (Tr. pp. 119-123). Plaintiff's condition had improved even further by April 16, 2004 and it was anticipated that he could advance to full duty status in 3 months. (Tr. p. 130).  Plaintiff was discharged from physical therapy on May 17, 2004 with instructions to continue with a home exercise program. (Tr. p. 106).  On July 2, 2004, plaintiff was upgraded to a medium work capability with a lifting limit of 40 pounds. (Tr. p. 129).  As a result of these back difficulties and resulting treatment, plaintiff was apparently awarded a closed period of disability benefits ending on July 2, 2004. (Tr. p. 271).

Commencing on October 11, 2004, plaintiff was periodically seen by Dr. Alan Yaeger for management of his hypertension and monitoring of his cholesterol levels as well as for a single episode of chest pain. (Tr. pp. 186-206).  On April 18, 2005, plaintiff presented himself to Dr. Donald Auzine of Urgent Care of

11

Metairie, Inc. (UCMI) with complaints of work-related low back pain.  Plaintiff reported his level of pain as a "7" and NSAIDS provided only minimal relief.  Dr. Auzine noted spasms radiating into the back and rendered a diagnosis of failed back syndrome and anxiety.  Vicodin, Soma, and Xanax were prescribed. (Tr. pp. 265-267).  As he later testified to at the administrative hearing, plaintiff began working for an ornamental iron works company on July 20, 2005 but was let go several weeks later because he could not function at the required pace. (Tr. pp. 287, 57). In the meantime, plaintiff had been seen by Dr. Robert Marshall on July 25, 2005.  Plaintiff described his pain as an "8" without medication but as a "2" with medication such that he was able to perform the activities of daily Living.  The assessment was chronic lower back pain and plaintiff was continued on his then-present medications. (Tr. pp. 262-263).

On August 23, 2005, plaintiff completed a form denominated "Function Report-Adult" that elicited information pertaining to his activities.  There, plaintiff indicated that his sleep and daily activities were limited by pain but that he was still able to attend to his personal needs, cook, sweep, mop, dust, clean , do laundry, drive, shop, and do some yardwork. (Tr. pp. 82-89). On October 13, 2005, plaintiff was continued on his medication regimen which consisted of Lorcet, Soma, and Valium. (Tr. pp. 260-261).

Plaintiff's condition was essentially unchanged when he returned to Dr. Marshall on November 10, 2005 and refills of the same medications were given. (Tr. pp. 257-259).

On November 17, 2005, plaintiff was consultatively evaluated by Dr. Mary Mathai at the request of the Administration.  Plaintiff complained of severe pain in his lower back; burning, aching, and cramping pain in the hips, thighs, lower legs, and feet; numbness in the thigh, legs, and feet; and, weakness in the leg muscles.  He also related increased pain with sitting, standing, lying down, bending, and lifting; neck pain; pain and numbness in the left arm; weakness in the right hand; aching pain in the left knee which gave way and locked; and, knee pain with stair-climbing.  In terms of functional status, plaintiff was independent in self-care activities, could walk 2 blocks without difficulty, could sit and stand for 30 to 60 minutes, could do household chores, and could mow the lawn with a self-propelled mower but was said to need help with cleaning the house.  On physical examination, flexion of the cervical spine was normal to 45 degrees, extension was normal to 40 degrees, lateral flexion was 40 degrees bilaterally, and rotation was 80 degrees bilaterally.  Plaintiff had a full range of motion and muscle strength in the shoulders, elbows, wrists, and hands and, on 3 attempts with a hand dynamometer, recorded grip strengths of 80, 70, and 65 pounds on the right and 65, 65, and 60 pounds on

13

the left.  In terms of the lower extremities, plaintiff had a full range of motion and muscle strength in the hips, knees, and ankles, but the left knee was tender.  Plaintiff could heel-to-toe walk, could stand and hop on each leg, and could squat.  With respect to the thoracic and lumbosacral spine, straight leg raising was full bilaterally with pain to the back but range of motion was decreased. There was decreased lumbar lordosis as well as muscle imbalance, increased kyphosis, and pain with facet loading.  Motor function was intact and gait was normal.  X-rays revealed sclerosis at L4-5 and L5-S1.  The impression was chronic lower back pain, clinically, and probable right L4-S1 radiculopathy with decreased or absent reflexes, status-post lumbar laminectomy.  In Dr. Mathai's opinion, plaintiff was not a candidate for work involving prolonged walking, standing, sitting, bending, carrying, or heavy lifting.  However, plaintiff was felt to be capable of light work as tolerated. (Tr. pp. 137-139).

Plaintiff returned to Dr. Marshall on December 8, 2005 for monitoring of his low back pain.  Although plaintiff's general condition was described as "uncomfortable", his pain level when taking his prescribed medication was still described as a "2" and the medication did allow the performance of daily activities. Plaintiff's medications were simply renewed. (Tr. pp. 254-255).

On December 28, 2005, an Administration medical consultant

14

reviewed plaintiff's file and completed a Physical Residual Functional Capacity Assessment form documenting his opinions on plaintiff's capabilities. There, the medical consultant indicated that plaintiff could lift 20 pounds occasionally, 10 pounds frequently; could sit, stand, and/or walk for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; could never climb ladders, could only occasionally climb stairs, kneel, crouch, and crawl but could frequently balance and stoop; had no manipulative, visual or communicative limitations; and, was to avoid concentrated exposure to vibration. In doing so, the consultant noted that the results of Dr. Mathai's recent evaluation were essentially normal from an objective standpoint except for decreased or absent reflexes on the right side consistent with L4-S1 decreased range of motion of the lumbosacral spine and slight atrophy of the left lower extremity. The consultant also observed that plaintiff could perform independent self-care activities, drive a car, cook, and shop. (Tr. pp. 145-152).

Plaintiff reported no change to his condition when he was next seen by Dr. Marshall on January 5, 2006 and refills on his Lorcet, Soma, and Valium were given. (Tr. pp. 251-253). The same was true on February 2, March 2, and March 30, 2006. (Tr. pp. 242-250). On April 27, 2006, plaintiff complained of a popping sensation in his left knee and he had also undergone surgery to his left hand to

address a tendon problem.  Still, his prescribed medication provided him adequate relief from pain and allowed him to perform daily activities. Plaintiff's prescriptions were refilled but Xanax was substituted for Valium. (Tr. pp. 239-240).  That substitution proved to be less than effective and plaintiff asked to be returned to Valium on May 22, 2006.  The assessment was chronic low back pain, anxiety, panic disorder, and left lower extremity pain. (Tr. pp. 236-238).

On May 30, 2006, plaintiff was evaluated by Dr. Kenneth Adatto of Orleans Orthopedic Associates.  At that time, plaintiff complained of pain to the neck, thoracic area, back, legs, and left shoulder which he attributed to a workplace accident on February 1, 2003.  On physical examination, plaintiff walked with a normal gait and demonstrated no anxiety or depression.  A cervical exam revealed limited motion and moderate spasm present at stress only but there was a full range of motion in both upper extremities with active motor, power, and sensation.  The thoracic examination was essentially normal but plaintiff had limited motion with moderate spasm present at both rest and stress in the lumbar area.  However, deep tendon reflexes were equal and active in both lower extremities and plaintiff was able to heel-to-toe walk without difficulty.  Plaintiff also had a full range of motion in the shoulders but there was mild tenderness with no swelling and no

16

muscle spasm.   The diagnosis was displacement of the lumbar intervertebral disc, neck sprain and strain, thoracic sprain and strain, and joint pain in the shoulder region.   Dr. Adatto recommended that plaintiff avoid activities that could exacerbate his condition and that he pursue remedies such as heat and cold to the affected area, aerobic conditioning, stretching, and strengthening regimens as tolerated. The prognosis for a return to normal function was rated as fair and an MRI was to be performed. (Tr. pp. 219-224).

Plaintiff's condition was unchanged when he returned to Dr. Marshall on June 5, 2006 for a refill on his prescription medications which adequately reduced his pain level to a "2" such that he could perform daily activities.  Valium was substituted for Xanax. (Tr. pp. 233-235).  By July 3, 2006, plaintiff's pain when taking his medication had slightly increased to a "3" on a scale of 1 to 10.   More Lorcet, Soma and Valium were dispensed. (Tr. pp. 230-232).   Plaintiff returned to Dr. Adatto on August 17, 2006 with complaints of pain to the neck, thoracic area, and back. There had been no overall change to plaintiff's health. An MRI had been done by that time which revealed spondylosis at C5-6 and a disc bulge at C6-7.   The diagnosis was displacement of the lumbar intervertebral disc.  The treatment plan included a home exercise program, periodic review, and evaluation and plaintiff was

17

discharged to be followed by a local pain management specialist. Dr. Adatto assessed plaintiff as having a 10-15% permanent anatomical impairment of the cervical and lumbar spine and advised him to avoid repetitive stooping or bending and repetitive lifting of over 10-20 pounds as well as prolonged sitting or standing in the same position for 45 minutes, plus or minus 15 minutes, without being able to move around and change positions. Plaintiff was also advised to avoid repetitive looking up and down or working with the arms above the shoulder level. (Tr. pp. 170-174, 214-218).

When plaintiff returned to Dr. Marshall on August 31, 2006, he reported that his pain had increased to a "4" even when on medication which was felt to be inadequate. However, he was still able to perform daily activities. Percocet, Soma, and Valium were prescribed. The diagnosis was an L5-S1 herniated disc status-post surgery on the right, L3-5 bulging discs with L4-5 and L5-S1 facet arthropathy, C5-6 disc osteophyte complex with bilateral foraminal narrowing, and a C6-7 disc bulge with bilateral foraminal narrowing. (Tr. pp. 226-229). Plaintiff was seen by Dr. Adatto one final time on September 21, 2006. Overall, plaintiff's condition remained unchanged. X-rays revealed marked disc space narrowing at L5-S1, moderate disc space narrowing at L4-5, and spur formation at L4-5 and L5-S1. The degree of plaintiff's permanent anatomical impairment and his functional limitations were the same as those

18

that had been imposed on August 17, 2006.  In three months, plaintiff was to return to Dr. Adatto, who deferred to the opinions of a vocational specialist on plaintiff's ultimate ability to work. (Tr. pp. 212-213).  The hearing _de novo_ before the ALJ subsequently went forward on October 26, 2006. (Tr. pp. 273-291).

As noted earlier, plaintiff challenges the ALJ's decision to deny Social Security benefits on one ground, namely, that the ALJ failed to properly credit plaintiff's subjective complaints of pain.  Plaintiff alleges that the ALJ failed to articulate any specific reasons for discrediting his allegations, doing so instead in the following boilerplate, conclusory paragraph with no accompanying rationale:

> [b]ased on the entire record, I find that the claimant will remain somewhat limited due to his neck and back impairment, but that the balance of the evidence does not support that he is incapable of performing any and all levels of sustained work.  Thus, based on this evaluation, I find that the claimant's assertions relative to symptomatology, pain, functional limitations and restrictions on activities of daily living are exaggerated, lack corroboration or substantiation in the medical evidence and testimony, and are not credible (20 CFR 404.1529 & 416.929 and SSR 96-7p).

(Tr. p. 22).

Contrary to plaintiff's present assertions, and for the reasons that follow, a fair reading of the ALJ's decision does not support his challenge.

In addressing plaintiff's challenge, the Court first notes

19

that the responsibility of weighing the evidence and determining
the credibility of witnesses' testimony and doctors' opinions lies
with the ALJ in the first instance. Carrier v. Sullivan, 944 F.2d
243, 247 (5th Cir. 1991); Griego v. Sullivan, 940 F.2d 942, 945 (5th
Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991);
Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990).  In addition,
the  law is clear that the burden is upon the plaintiff to produce
objective medical evidence of a condition that could reasonably be
expected to produce the level of pain or other symptoms complained
of.  Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper
v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989).  The ALJ must then
weigh the plaintiff's testimony and subjective complaints against
the objective medical evidence that has been produced.  Chaparro v.
Bowen, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing Jones, 702 F.2d
at 621 n.4).  The evaluation of a plaintiff's subjective symptoms
is a task particularly within the province of the ALJ for it was
the ALJ who had an opportunity to observe the plaintiff, not the
Court.  Harrell, 862 F.2d at 480.  The ALJ may discredit a
plaintiff's subjective complaints of pain and other limitations if
he carefully weighs the objective medical evidence and articulates
his reasons for doing so.  Anderson v. Sullivan, 887 F.2d 630, 633
(5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir.
1988)).

In his written decision of December 15, 2006, the ALJ properly recalled his obligation to determine plaintiff's ability to engage in substantial gainful activity by utilizing the 5-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920.  The ALJ first found that plaintiff's brief return to work in July of 2005 had been an unsuccessful work attempt and that plaintiff thus had not engaged in substantial gainful activity since the alleged onset date. (Tr. pp. 17-18).  Proceeding to step 2 of the analysis, the ALJ then found that plaintiff suffered from the following severe impairments: status post right-sided microdiscectomy at the L5-S1 level in January of 2004; degenerative disc disease of the lumbar spine at the L3-4, L4-5, and L5-S1 levels; degenerative disc disease of the cervical spine at the C5-6 and C6-7 levels; and, status post surgical repair of the tendons in the left hand with full restoration of flexion and extension of the left index finger. (Tr. p. 18).  At step 3 of the sequential analysis, the ALJ concluded that the foregoing impairments, while severe, did not meet or equal the criteria of any of those set forth in the Listing of Impairments. (Id.).

Properly proceeding to steps 4 and 5 of the sequential analysis, the ALJ then made an assessment of plaintiff's residual functional capacity to perform work-related activities despite his impairments as required by 20 CFR §§404.1520(e) and 416.920(e).  In

doing so, the ALJ noted, the credibility of plaintiff's subjective complaints must be weighed against the objective evidence of record based on the various factors enumerated in SSR 96-7p. (Tr. p. 18). Over the next several pages of his decision, the ALJ methodically discussed at length the findings of the treating and consulting physicians as well as plaintiff's hearing testimony. (Tr. pp. 18-22).  The ALJ recalled that plaintiff had been cleared to perform medium-level work with a 40 pound lifting limit within 6 months of his surgery by Dr. Dowd. (Tr. pp. 18-19).  The ALJ also recalled the results of Dr. Mathai's November 17, 2005 consultative evaluation which restricted plaintiff from work involving prolonged walking, standing, sitting, bending, carrying, or heavy lifting but cleared him to perform light-level work. (Tr. p. 19).  Aside from the visits plaintiff made to Dr. Marshall, where he described his pain as manageable with pain medication, the ALJ additionally noted that plaintiff had not sought any treatment for his back or neck in the roughly 2-year period from mid-2004 until May of 2006. (Id.).

Next, the ALJ discussed the findings made by Dr. Adatto on May 30, August 17, and September 21, 2006 as well as the results of the July 28, 2006 MRI. (Tr. p. 20).  At the last of those evaluations, Dr. Adatto opined that plaintiff should avoid repetitive stooping or bending; repetitive lifting of over 10 to 20 pounds; prolonged sitting or standing in the same position for 45 minutes, plus or

22

minus 15 minutes, before alternating positions; repetitive looking up and down; and, work with the arms above shoulder level.   As plaintiff's treating physician, the opinions of Dr. Adatto are ordinarily entitled to great weight, <u>Leggett v. Chater</u>, 67 F.3d 558, 566 (5th Cir. 1995), and that is precisely the weight that the ALJ afforded them in this case. (Tr. p. 22).   It was the very limitations imposed by Dr. Adatto which the ALJ later incorporated into his hypothetical question to the VE the administrative hearing.

After recalling some additional treatment for a hand injury plaintiff received in April of 2006 as well as the results of a consultative psychological evaluation, the ALJ turned to the limitations that were testified to by plaintiff at the administrative hearing. (Tr. pp. 22-22).   In doing so, the ALJ noted that many of plaintiff's subjective complaints lacked objective support in the record.   For example, while plaintiff testified to being significantly limited due to back and neck pain and medication side-effects, no mention of any such side-effects is made in any of his treatment records.   On the contrary, of the multiple documented times that plaintiff was seen at Urgent Care of Lafayette, when he took his prescribed medication his pain was described as a "2" on 9 of those occasions, as a "3" on one occasion, and as a "4" on the final occasion.   And on all of those

occasions the doctor noted that plaintiff's medications allowed him to perform the activities of daily living.  A condition that can reasonably be remedied or controlled by medication or other prescribed treatment cannot be considered disabling.  <u>Lovelace v. Bowen</u>, 813 F.2d 55, 59 (5th Cir. 1987).  Furthermore, the mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining Social Security benefits.  <u>Owens v. Heckler</u>, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing <u>Jones</u>, 702 F.2d at 621 n. 4).

The ALJ additionally observed that while plaintiff testified that he could not grip or lift with either hand due to his April 2006 left hand injury and having a portion of his right little finger amputated over 10 years earlier, the treatment records pertaining to the left hand do not support such a level of debilitation and plaintiff was apparently able to work over the years in spite of his earlier right hand injury.  <u>Johnson</u>, 864 F.2d at 347-48 (citing <u>Fraga</u>, 810 F.2d at 1306 n. ll). The asserted lack of grip strength on the right is also undercut by Dr. Mathai's test results that plaintiff could grip between 80 to 65 pounds.  The activities that plaintiff identified he was capable of in his August 23, 2005 Function Report are also not indicative of someone who is incapable of performing any work whatsoever.  The ALJ may properly consider such reports in determining a claimant's

disability status.  <u>Vaughn v. Shalala</u>, 58 F.3d 129, 131 (5th Cir. 1995); <u>Villa</u>, 895 F.2d at 1022-23.

Subjective testimony and complaints do not take precedence over objective medical evidence.  Here, the ALJ cited several diagnoses from treating and consulting physicians which were at odds with plaintiff's subjective complaints and he provided several reasons for giving plaintiff's testimony the weight that he did. That fulfills his duty here.  <u>Godbolt v. Apfel</u>, 1999 WL 179476 at *9 (E.D. La. 1999)(citing <u>Falco v. Shalala</u>, 27 F.3d 160, 164 (5th Cir. 1994)).  <u>See</u> <u>also</u> <u>Augustine v. Barnhart</u>, 2002 WL 927797 at *4 (E.D. La. 2002); <u>Collins v. Callahan</u>, 1998 WL 118082 at *3-4 (E.D. La. 1998).

### **RECOMMENDATION**

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

25

consequences will result from a failure to object.   <u>Douglass v.</u>
<u>United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this __30th__ day of _____September_____,
2008.


_____
UNITED STATES MAGISTRATE JUDGE

26